# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT KNOXVILLE
### April 24, 2001 Session

## STATE OF TENNESSEE v. DARRELL PRESNELL

### Direct Appeal from the Circuit Court for Cocke County
### No. 6878     Ben W. Hooper, II, Judge

### No. E2000-02544-CCA-R3-CD
### August 20, 2001

The defendant, Darrell Presnell, who was indicted for especially aggravated robbery, was convicted of the lesser included offense of aggravated robbery. The trial court imposed a sentence of ten years. In this appeal of right, the defendant contends that (1) there was a fatal variance between the presentment and the proof at trial; (2) the trial court erred by instructing the jury on aggravated robbery as a lesser included offense; and (3) the trial court erred by not instructing the jury on the lesser included offense of robbery. Because the trial court failed to instruct on the lesser offense of robbery, the judgment must be reversed and the case must be remanded for a new trial.

### Tenn. R. App. P. 3; Judgment of the Trial Court Reversed and Remanded.

GARY R. WADE, P.J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Melinda Meador, Knoxville, Tennessee, for the appellant, Darrell Presnell.

Paul G. Summers, Attorney General & Reporter; Mark A. Fulks, Assistant Attorney General; and James B. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At approximately 9:15 p.m. on March 22, 1995, Sergeant Ronnie Landers of the Newport Police Department was dispatched to a location on Main Street between the K & W Café and Kitty's Place. When the officer arrived on the scene, the victim, Landon Holdway, was unconscious and bleeding from his nose, his mouth, and the side of his head. The contents of a billfold were scattered around him. When an ambulance and other officers arrived on the scene, Sergeant Landers escorted Inez Swangum, who had been with the victim during the course of the evening, to the police department for questioning.

Dr. Carroll Shanks, an emergency room physician at the University of Tennessee Hospital, determined that the victim, a 53-year-old male, had been beaten about the head and face with a blunt

object. Fractures of the left cheekbone and upper jaw required surgery. Dr. Shanks inserted plates to stabilize the fractures and wired the victim's jaws. The victim was intoxicated. His urine samples tested positive for amphetamines.

Randall Shelton, who was once married to a first cousin of the defendant, was at a bar known as the K&W Café on the night of the robbery. Shelton, a witness for the state at the trial, testified that just prior to the robbery, he observed the defendant go in and out of the bar several times. When he went outside to investigate, Shelton encountered Mitchell Presnell, who was armed with a gun, and Jimmy Don Jones. Jones left momentarily to get his car and when he returned, Mitchell Presnell waved the gun and directed Shelton to return to the bar. Once inside, Shelton saw that when the victim attempted to leave, he was met by the defendant, who "strong-armed" him out the door and into an alley. At that point, two girls entered the bar screaming. At trial, Shelton explained that he did not go outside because he had "seen more than [he] wanted to see." After the robbery, Shelton observed that the victim was unconscious and bleeding and that his "shirt and papers [were] everywhere."

Freddy Jackson, who was at a Main Street bar called Alice's on the night of the robbery, also testified for the state. Jackson recalled seeing the victim, whom he described as highly intoxicated, enter Alice's just prior to the robbery. Soon afterward, the defendant arrived, eventually followed by Mitchell Presnell and Jimmy Don Jones. When the victim and the woman accompanying him left the bar several minutes later, the defendant, Mitchell Presnell, and Jones also left. Sometime later, Jackson, who owned the K&W Café, received a call and learned that someone had been hurt at his bar. When Jackson arrived, the victim was lying in the alley. Jackson called 911.

Vanessa Stewart, an eyewitness to the robbery of the victim, testified that she observed Jimmy Don Jones, the defendant, and Mitchell Presnell drag the victim into an alley located around the corner from the K&W Café. According to Ms. Stewart, all three of the men then beat and kicked the victim; however, she did not see any of the men use weapons. When she informed the assailants that she intended to contact the police, Jimmy Don Jones grabbed her arm and demanded that she not make the call. Ms. Stewart testified that Jones removed a billfold from the victim's pocket. She also recalled that immediately after the robbery, the three men left in a yellow Chevrolet automobile driven by Jones.

Rhonda Carr, Vanessa Stewart's sister, also witnessed the robbery. Ms. Carr saw the defendant force the victim into the alley where Jimmy Don Jones and Mitchell Presnell waited. According to Ms. Carr, the men beat the victim with their fists. Ms. Carr testified that when she warned the men that she was going to call the police, Jones grabbed her arms and told her that it "would be in [her] interests" not to do so. Ms. Carr also saw Jones take the billfold from the victim's pocket.

The victim, Landon Holdway, testified that on the day of the robbery he had driven to Newport to purchase some gasoline for his lawnmower. While there, he stopped at the K&W Café where he met a woman named Inez. He explained that when he left the bar to return to his residence,

she accompanied him. According to the victim, he drove back to the K&W, arriving at approximately 5:30 p.m. The victim recalled that later in the evening, he was walking towards the restroom when he was "strong-armed" out the door by the defendant. He lost consciousness when struck on the left temple. The victim testified that his assailants took his 993 Hamilton pocket watch, valued at about $700, and his income tax refund, which was approximately $2,400 in cash. He recalled that he was unable to eat solid food for about eight weeks following the attack. When shown photographs by the police, the victim identified Jimmy Don Jones, Mitchell Presnell, and the defendant as his assailants.

Officer Wayne Ball of the Newport Police Department testified that on March 22, 1995, he received information that someone had been beaten and robbed outside the K&W. Officer Ball, who was instructed to be on the lookout for a cream-colored Chevrolet, observed a yellow Chevrolet Malibu exit the Eastport Market parking lot and then turn in the opposite direction. The officer pursued the car, but lost sight of it due to heavy traffic. While he did not see the driver of the vehicle, the officer identified Jimmy Don Jones as a passenger.

Jimmy Don Jones, who was also charged in the crime, was a witness for the state. He recalled that he was at the K&W on the evening of the robbery, well before the defendant and Mitchell Presnell arrived. According to Jones, the defendant "did most of the beating on" the victim. While Jones acknowledged ownership of the getaway car, he contended that Mitchell Presnell drove and that the defendant was in the backseat. Jones testified that when a police car began to follow, they abandoned the car and left on foot. Jones denied having taken any money from the victim, but acknowledged the receipt of approximately $500 from Mitchell Presnell. He testified that he had pled guilty to aggravated robbery, for which he received an eight-year sentence. On cross-examination, Jones explained that because he had been drinking and was unable to drive, he gave Mitchell Presnell his car keys. He stated that as he and Mitchell Presnell left the bar by the back door, the defendant was involved in a fight with the victim. He claimed that he and Mitchell Presnell were not involved in the fight.

Jimmy Gregg, an officer with the Newport Police Department, investigated the robbery. When he arrived at the scene, he discovered blood on the pavement and the scattered contents of the victim's billfold. When Officer Gregg spoke with the victim at the hospital, he was unable to obtain any information about the robbery. Later, he heard on his police radio that Jimmy Don Jones' car had been involved in a chase. Police found Jones's vehicle abandoned on the side of the road near an interstate overpass. Eventually, Officer Gregg located Mitchell Presnell and found him in possession of $703. Officer Gregg transferred Mitchell Presnell to the custody of another officer, returned to the vicinity of Jones's vehicle, and then found and arrested Jones, who had $886 in his possession. Officer Gregg found the victim's voter registration card, hunting card, and benefit identification card on the front seat of Jones's vehicle.

At the conclusion of the state's proof, the defendant's younger brother, Lindsey Presnell, appeared as a defense witness. He testified that he met the defendant at their mother's residence at approximately 6:00 or 6:30 on the evening of the robbery. While there, he invited the defendant, who was repairing his mother's roof, to go out for a beer. Eventually, they went to the K&W, where they

stayed for approximately forty-five minutes before walking to the Sidewalk Bar and playing a game of pool. The two men then returned to the K&W. Lindsey Presnell recalled that he left the K&W to drive a friend to Bryant Town Homes. When he returned, the defendant was no longer at the bar. Lindsey Presnell testified that he searched for the defendant at both the Sidewalk and the Matchbox, but was unable to locate him.

Marietta Presnell, the defendant's wife, testified that on the day of the robbery, the defendant returned home from work at 4:00 or 4:30 p.m. and then accompanied her to his mother's house to repair the roof. She recalled that while they were there, the defendant's brother, Lindsey Presnell, asked the defendant to join him for a few beers in celebration of his birthday. Ms. Presnell recalled telling the defendant to return to their home by 10:00 p.m. When he did not arrive on time, Ms. Presnell looked for him, first at Fruit Jar Alley, then at the K&W, and finally at the Matchbox. Unable to find the defendant, she drove to a convenience store to purchase some gas and other items. When she returned to the Matchbox, the defendant "come running and jumped in the car." Ms. Presnell testified that the defendant explained that he was trying to get away from an ex-girlfriend, who was on Fruit Jar Alley. She then drove the defendant to their home, where, she claimed, the defendant ate dinner, watched the news, and went to bed.

The defendant, who was thirty-six years old at the time of trial, testified that on the day of the robbery, he was working on his mother's roof when Lindsey Presnell arrived and invited him out for a beer. The defendant claimed that his wife, who disapproved of his plans, agreed to pick him up later either on Fruit Jar Alley or at the Matchbox. The defendant stated that he arrived at the K&W Café after 8:00 p.m, where he met his older brother, Mitchell Presnell, and Jimmy Don Jones. According to the defendant, he and Lindsey Presnell spoke briefly with Mitchell Presnell and Jones. Later, the defendant was standing by himself at the bar drinking a beer when he saw his ex-girlfriend nearby. Believing that she was angry with him, the defendant hurriedly left the bar. He contended that he was approached by a car occupied by his brother Mitchell Presnell and Jimmy Don Jones, who offered him a ride. The defendant explained that the two men dropped him off in front of a BP station near the Matchbox, where he met his wife.

Imogene Williams, the defendant's former girlfriend, testified that on the evening of the robbery, she saw the defendant go into the K&W Café. When she followed him inside, she observed Mitchell Presnell and Jimmy Don Jones sitting in a booth. Ms. Williams claimed that after she informed the defendant that she wanted to speak to him, he "shot out the back door" and she followed. She testified that the defendant directed her to stay away from him because he was afraid that the police would intervene. According to Ms. Williams, the defendant walked away. She denied seeing the victim with any money and denied having any knowledge that the victim would be robbed.

I

The defendant claims that the evidence was insufficient because there was a material variance between the presentment and the state's proof. He also asserts that it was error for the trial court to

charge the jury on aggravated robbery because there was no proof that the victim's injuries were caused by a gun.

Provisions of both the federal and Tennessee constitutions guarantee the criminally accused knowledge of the "nature and cause of the accusation." U.S. Const. amend. VI; see also Tenn. Const. art. I, § 9. In order to comply with these constitutional guidelines, an indictment or presentment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. Tenn. Code Ann. § 40-13-202; State v. Byrd, 820 S.W.2d 739 (Tenn. 1991); State v. Pearce, 7 Tenn. 66, 67 (1823). A variance between an indictment and the evidence presented at trial is not fatal unless it is both material and prejudicial, State v. Moss, 662 S.W.2d 590 (Tenn. 1984), thus affecting the substantial rights of the accused, State v. Mayes, 854 S.W.2d 638, 639-40 (Tenn. 1993) (citing Berger v. United States, 295 U.S. 78, 82 (1935)). When the indictment and the proof substantially correspond, the defendant is not misled or surprised at trial ,and there is protection against a second prosecution for the same offense, the variance is not considered material. Moss, 662 S.W.2d at 592.

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Robbery becomes aggravated where

> (1) [it is] [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or
> (2) [] the victim suffers serious bodily injury.

Tenn. Code Ann. § 39-13-402(a). Especially aggravated robbery is robbery that is

> (1) [a]ccomplished with a deadly weapon; and
> (2) [w]here the victim suffers serious bodily injury.

Tenn. Code Ann. § 39-13-403(a).

The presentment in this case included charges that in March of 1995, the defendant

> did unlawfully, intentionally and knowingly, obtain property, money, from the person of Landon Holdway by violence and accomplished by the use of a deadly weapon, to wit: gun, as a result of which Landon Holdway suffered serious bodily injury, in violation of T.C.A. § 39-13-403 . . . .

The defendant argues that the wording of the presentment required the state to prove that the injuries to the victim were caused by a gun.

Initially, the content of the presentment was adequate to support a charge of especially aggravated robbery. In addition to alleging each of the elements of especially aggravated robbery, specific reference was made to the statute defining the crime. See State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000) (noting that "relaxation of the strict pleading requirements of the common law is . . . apparent from recent [Tennessee supreme court] decisions [] holding that an indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements"). By also identifying the victim and the month and year of the robbery, the presentment provided the defendant with notice of the offense charged and protection against double jeopardy.

In our view, the wording of the presentment did not require the state to prove that the injuries were caused by a gun. Rather, the dependent clause reciting that the victim suffered serious bodily injury plainly applies to the robbery allegations as a whole, not merely to the allegation that a gun was used in the crime. Nor was there, in our view, a material variance between the presentment and the proof at trial. Although some witnesses testified that they did not observe a gun, Randall Shelton testified that Mitchell Presnell was in possession of a gun immediately prior to the robbery.

The defendant also contends that it was error for the trial court to charge the jury on the lesser included offense of aggravated robbery. The defendant argues that while the proof would ordinarily merit an aggravated robbery charge, the language of the presentment precludes such a charge to the extent that it alleges that the injuries to the victim were caused by a gun. Because the language of the indictment did not have this effect, this issue is without merit.

II

The defendant next asserts that the trial court erred by failing to instruct the jury on the lesser included offense of robbery.

The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). There is an obligation "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Tenn. Code Ann. § 40-18-110(a). Pursuant to our statute and case law interpretations, defendants are entitled to jury instructions on all lesser offenses for which the evidence would support conviction. Complete instructions allow the jury to determine among each alternative the appropriate offense, if any, for conviction and to more evenly balance the rights of the defendant and the state. It is only when the record is devoid of evidence to support an inference of guilt of the lesser offense that the trial court is relieved of the responsibility to charge the lesser crime. Stephenson, 878 S.W.2d 530, 550 (Tenn. 1994); State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990).

An offense is a lesser included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

> (1) a different mental state indicating a lesser kind of culpability; and/or
>
> (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>
> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in part (a) or (b); or
>
> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999).

The guiding principle in determining whether to instruct on a particular lesser included offense is that if there is evidence in the record from which the jury could have concluded that the lesser included offense was committed, there must be an instruction for the offense. See Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). In State v. Burns, our supreme court adopted a two-step process in determining whether the evidence justifies a jury instruction on a lesser included offense:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

6 S.W.3d at 469. In making this determination, it is not necessary that the court find "that a basis exists for acquitting the defendant of the greater offense." State v. Bowles, ___ S.W.3d ___, No. M1997-00092-SC-R11-CD, slip op. at 11 (Tenn. 2001).

Robbery is a lesser included offense of especially aggravated robbery under part (b) of the Burns test. The trial court declined to instruct the jury on robbery because "it [did not] fit the facts of this case." In our view, the trial court erred. The proof demonstrates that the victim sustained "serious bodily injury" as a result of the offense. While serious bodily injury is an element of both aggravated robbery and especially aggravated robbery, however, its presence does not preclude a conviction for simple robbery. See Tenn. Code Ann. § 39-13-401(a); see also Bowles, ___ S.W.3d at ___, slip op. at 11. Whether an injury qualifies as serious is for determination by the jury. Accordingly, the trial court should have given the requested robbery instruction.

In State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998), our supreme court concluded that the right to instructions on lesser offenses was based upon a statutory requirement. In consequence, the high court directed that any error in the omission of a lesser included offense would be subject to the following harmless error analysis:

> Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

Id.

In State v. Bolden, 979 S.W.2d 587 (Tenn. 1998), the defendant, who was charged with premeditated first degree murder, was willing to gamble on an "all or nothing" verdict by asking the trial judge not to charge the lesser included offense of second degree murder; the trial judge refused and the defendant was convicted on that lesser crime. While our supreme court affirmed that second degree murder conviction, its opinion emphasized the mandate of the statute requiring trial courts to "instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction of the lesser offense." Id. at 593. Our supreme court also acknowledged that a "purpose of the statute is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment [and to] facilitate[] the overall truth-seeking function of the process." Id. If the failure to charge a lesser included offense was an error of constitutional dimension, as Bolden implied, the proper question would have been whether the error was harmless beyond a reasonable doubt. In State v. Swindle, 30 S.W.3d 289, 293 (Tenn. 2000), however, our supreme court followed the rationale in Williams and held that reversal was required only "if the error affirmatively affected the result of trial, or if the error more probably than not affected the judgment to the defendant's prejudice." The high court concluded that the trial court's failure to instruct misdemeanor assault as a lesser included offense of the primary charge, aggravated sexual battery, was harmless error under Tenn. R. Crim. P. 52(a).

Recently, in State v. Ely, ___ S.W.3d ___, Nos. E1998-00099-SC-R11-CD, E1999-00170-SC-R11-CD (Tenn. 2001), our supreme court clarified the holding in Williams and ruled that the failure to charge a lesser included offense indeed qualifies as an error of constitutional proportion:

[T]he right of trial by jury is of constitutional dimension [as] evidenced by its embodiment in Article I, section 6 of the Tennessee Constitution, which states, "the right of trial by jury shall remain inviolate." Accordingly, we hold that this constitutional right is violated when the jury is not permitted to consider all offenses supported by the evidence.

Ely, ___ S.W.3d at ___, slip op. at 17 (emphasis in original). Our high court directed that in reviewing error arising from a failure to charge one or more lesser included offenses, "the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt." Id.

Using the Ely standard, this court cannot conclude that the trial court's failure to give a robbery instruction was harmless beyond a reasonable doubt. Although the defendant was indicted for especially aggravated robbery, the jury chose to find him guilty only of aggravated robbery. While the victim sustained injury as a result of the offense, it should have been the prerogative of the jury to determine whether the facts suggested an aggravated robbery or a simple robbery. Had the defendant been convicted of simple robbery on these facts, this court would have sustained the conviction. The defendant is, therefore, entitled to a new trial with instructions on the lesser included offenses.

A concurring opinion authored by Chief Justice Rehnquist in Sullivan v. Louisiana describes the duty of the appellate court in circumstances where there is constitutional error:

[T]he reviewing court is usually left only with the record developed at trial to determine whether it is possible to say beyond a reasonable doubt that the error did not contribute to the jury's verdict. . . . [A]ny time an appellate court conducts harmless-error review it necessarily engages in some speculation as to the jury's decisionmaking process; for in the end no judge can know for certain what factors led to the jury's verdict.

508 U.S. 275, 283 (1993) (Rehnquist, J., concurring).

In Fahey v. Connecticut, 375 U.S. 85 (1963), our highest court observed that the real question when there is a constitutional violation is whether there is "a reasonable possibility" that error might have contributed to the conviction. In Chapman v. California, 386 U.S. 18, 24 (1967), our Supreme Court approved of that language and further concluded that when constitutional error had occurred, appellate courts had the obligation "to declare a belief that it was harmless beyond a reasonable doubt." Had it been allowed to consider simple robbery as an alternative, there is a "reasonable possibility" that the jury may have convicted on that offense. While perhaps not entirely probable under these facts, there is that rational possibility.

Accordingly, the defendant's aggravated robbery conviction must be reversed. The cause is remanded for a new trial.

_____
GARY R. WADE, PRESIDING JUDGE